IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
June 19, 2001 Session

## CLIFFER SAULSBERRY v. LABORATORY CORPORATION OF AMERICA, AKA LABCORP OCCUPATIONAL TESTING SERVICES

A Direct Appeal from the Circuit Court for Shelby County
No. 87436 T.D.     The Honorable James F. Russell, Judge

### No. W2000-02826-COA-R3-CV - Filed August 6, 2001

Plaintiff truck driver was required to submit to a random urine drug test pursuant to his employer's drug policy and mandatory Department of Transportation (DOT) guidelines. After the specimen tested positive for the presence of cocaine metabolites, plaintiff was discharged from his employment. Plaintiff sued the laboratory that conducted the test, alleging negligence in the testing procedure that resulted in a false report. The trial court granted the laboratory summary judgment, and plaintiff appeals. We reverse.

**Tenn.R.Civ.P. 3; Appeal as of Right; Judgment of the Circuit Court Reversed and Remanded**

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY KIRBY LILLARD, J., joined.

Roger K. Rutledge, Gregory C. Morton; Memphis, For Appellant, Cliffer Saulsberry

Charles McPherson, William E. Godbold, III; Memphis; D. Faye Caldwell; Houston For Appellee, Laboratory Corporation of America

### OPINION

Plaintiff, Cliffer Saulsberry, sued defendant, Armstrong Transfer & Storage Co., Inc. ("Armstrong"), and LabCorp Occupational Testing Services ("LabCorp"), for damages resulting from his discharge from Armstrong's[1] employment because of the alleged negligence of LabCorp in performing a random drug test. Saulsberry worked as a truck driver for Armstrong, a regional

---

[1] After the trial court granted partial summary judgment Armstrong, plaintiff voluntarily dismissed the action as to Armstrong, and Armstrong is not involved in this appeal.

agent for United Van Lines ("United").  In 1989, Mr. Saulsberry became an owner-operator under a contract with Armstrong.  Under a lease/purchase agreement with Armstrong, Mr. Saulsberry acquired his truck and hauled household goods for Armstrong directly, or for Armstrong in its capacity as agent for United.

On May 10, 1996, pursuant to Armstrong's written drug policy and mandatory Department of Transportation ("DOT") guidelines[2], Armstrong's dispatcher notified Saulsberry that he had been selected to submit to a random drug test.  After obtaining a "test kit" from Armstrong, Saulsberry reported to the Southaven, Mississippi LabCorp collection site.

Upon arriving at LabCorp, Mr. Saulsberry was given a specimen cup.  The record does not indicate if the specimen cup was labeled with Mr. Saulsberry's name or any other identifying information.  Mr. Saulsberry was then directed to the restroom, where he urinated into the cup.  After stepping out of the restroom, Mr. Saulsberry brought the urine specimen over to a table with several

[2]49 C.F.R. § 382.305 provides, in relevant part:

(a) Every employer shall comply with the requirements of this section. Every driver shall submit to random alcohol and controlled substance testing as required in this section.

\*     \*     \*

(i) The selection of drivers for random alcohol and controlled substances testing shall be made by a scientifically valid method, such as a random number table or a computer-based random number generator that is matched with drivers' Social Security numbers, payroll identification numbers, or other comparable identifying numbers. Under the selection process used, each driver shall have an equal chance of being tested each time selections are made.

(j) The employer shall randomly select a sufficient number of drivers for testing during each calendar year to equal an annual rate not less than the minimum annual percentage rate for random alcohol and controlled substances testing determined by the FHWA Administrator. If the employer conducts random testing for alcohol and/or controlled substances through a consortium, the number of drivers to be tested may be calculated for each individual employer or may be based on the total number of drivers covered by the consortium who are subject to random alcohol and/or controlled substances testing at the same minimum annual percentage rate under this part or any DOT alcohol or controlled substances random testing rule.

(k) Each employer shall ensure that random alcohol and controlled substances tests conducted under this part are unannounced and that the dates for administering random alcohol and controlled substances tests are spread reasonably throughout the calendar year.

(l) Each employer shall require that each driver who is notified of selection for random alcohol and/or controlled substances testing proceeds to the test site immediately; provided, however, that if the driver is performing a safety-sensitive function, other than driving a commercial motor vehicle, at the time of notification, the employer shall instead ensure that the driver ceases to perform the safety-sensitive function and proceeds to the testing site as soon as possible.

(m) A driver shall only be tested for alcohol while the driver is performing safety-sensitive functions, just before the driver is to perform safety- sensitive functions, or just after the driver has ceased performing such functions.

other specimen cups, and waited by the table. During this time, Mr. Saulsberry testified that other people came by the table and dropped off specimens, as well.

At some point, one of LabCorp's technicians picked up what purported to be Mr. Saulsberry's specimen, and divided it into two smaller containers.[3] The technician placed labels on the two bottles and asked Mr. Saulsberry to initial each bottle. The samples were then shipped to LabCorp's laboratory for testing. Mr. Saulsberry's "primary specimen" tested positive for the presence of cocaine metabolites, and LabCorp notified United's Medical Review Officer ("MRO") of the results. The MRO in turn notified Armstrong of the test results, and, on May 16, 1996, the MRO told Mr. Saulsberry that the specimen had tested positive.

After the MRO gave Mr. Saulsberry the test results, Saulsberry questioned the validity of the results. The MRO advised Mr. Saulsberry that he could have the "split specimen" tested for a $125.00 fee. Mr. Saulsberry sent a money order to LabCorp by Federal Express requesting the additional test, and LabCorp sent the "split specimen" to another laboratory for testing. The second test was also positive for cocaine metabolites, and, on May 22, 1996, Armstrong's President, Tom Watson, terminated the company's contract with Mr. Saulsberry for failing the drug test.

On May 9, 1997, Mr. Saulsberry filed this action against Defendants Armstrong and LabCorp, alleging, ***inter alia***, breach of contract, fraud, negligence, defamation, and infliction of emotional distress. On June 13, 1997, Defendants filed a Notice of Removal to the United States District Court for the Western District of Tennessee, and on July 24, 1997, the case was remanded to state court for lack of federal diversity jurisdiction. On March 8, 2000, LabCorp filed a Motion for Summary Judgment as to all allegations in Mr. Saulsberry's complaint. Similarly, on April 3, 2000, Armstrong filed a Motion for Partial Summary Judgment on the defamation claim. On September 21, 2000, the trial court held a hearing on the Defendants' motions and granted both motions. On October 25, 2000, Mr. Saulsberry filed a Notice of Voluntary Nonsuit as to the remaining claims against Armstrong and a Notice of Appeal from the Order granting summary judgment against LabCorp.

The issue on appeal is whether the trial court erred in granting summary judgment to LabCorp. Saulsberry asserts that the trial court erred in holding that his claim was preempted by federal law under 49 U.S.C. § 31306 (Omnibus Transportation Employee Testing Act of 1991). He also asserts that the trial court erred in finding that he failed to establish causation in his negligence claim against LabCorp.

A motion for summary judgment should be granted only when the movant demonstrates that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a

---

[3]Under 49 C.F.R. § 40.25(f)(10)(i)(B), if a collection container is used, the technician collecting the sample must pour the urine into two separate containers. One of these containers, the "primary specimen," is sent for testing, and the other is preserved so that in the event of a positive test, the employee being tested can submit the "split specimen" for independent analysis.

matter of law. **_See_** Tenn. R. Civ. P. 56.03. The party moving for summary judgment bears the burden of demonstrating that no genuine issue of material fact exists. **_See Bain v. Wells_**, 936 S.W.2d 618, 622 (Tenn. 1997). On a motion for summary judgment, the court must take the strongest legitimate view of the evidence in favor of the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. **_See id._** In **_Byrd v. Hall_**, 847 S.W.2d 208 (Tenn. 1993), our Supreme Court stated:

> Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. In this regard, Rule 56.05 provides that the nonmoving party cannot simply rely upon his pleadings but must set forth *specific facts* showing that there is a genuine issue of material fact for trial.

**_Id._** at 210-11 (citations omitted) (emphasis in original).

Summary judgment is only appropriate when the facts and the legal conclusions drawn from the facts reasonably permit only one conclusion. **_See Carvell v. Bottoms_**, 900 S.W.2d 23, 26 (Tenn. 1995). Since only questions of law are involved, there is no presumption of correctness regarding a trial court's grant of summary judgment. **_See Bain_**, 936 S.W.2d at 622. Therefore, our review of the trial court's grant of summary judgment is **_de novo_** on the record before this Court. **_See Warren v. Estate of Kirk_**, 954 S.W.2d 722, 723 (Tenn. 1997).

We do not determine that the trial court held that plaintiff's claim was preempted by the Federal Omnibus Transportation Employee's Testing Act of 1991, 49 U.S.C. § 31305 *et seq.* ("FOTETA"). The trial court stated in ruling on the motion for summary judgment:

> The plaintiff, on the other hand, argues that LabCorp's contention that the plaintiff's negligence is barred due to lack of a private cause of action under the testing is without merit. The plaintiff points out and argues that it is not seeking a private civil remedy under the drug testing act as is asserted by LabCorp. In contrast, the plaintiff argues that it simply is offering LabCorp's Department of Transportation infractions as evidence of its negligent conduct under Tennessee law and relies upon similar situations, citing OSHA cases for example.

The trial court's statements were premised on the assertions made by plaintiff's counsel in opposition to the motion for summary judgment:

And so, Your Honor, the simple fact is, sure, there's no right of relief under the drug testing act, but there is a right of relief under our state law in Tennessee.

A somewhat similar scenario existed in *Hanson v. DrugScan*, 95 F.Supp.2d 868 (N.D. Ill. 2000), wherein plaintiff was fired as a result of the drug testing company's erroneous report. He sued, alleging negligence, resulting in various items of damages. The court, in ruling that there was no preemption by virtue of the federal regulations governing drug testing, aptly said:

> Hanson's claim that DrugScan was negligent in testing would not appear to arise under any federal law. Negligence by a private firm is a classic state law issue.

*Id.* at 871.

We do not feel it necessary to discuss extensively the preemption doctrine. An excellent analysis of preemption is found in an opinion of our Supreme Court in *Riggs v. Burson*, 941 S.W.2d 44, 48 (Tenn. 1997), but because preemption is not an issue in the instant case, we will not unduly lengthen this opinion with the Supreme Court's discussion.

There is no private right of action to enforce DOT drug testing regulation under FOTETA. *See Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299 (6th Cir. 2000). In *Parry*, the Court said:

> This Court similarly concludes that the FOTETA is framed as a general mandate to the Department of Transportation as the regulations promulgated under part 40 are applicable to the Federal Highway Administration, Federal Railroad Administration, Federal Transit Administration and Federal Aviation Administration. *See* 49 C.F.R. § 40.25(f)(10)(B). This regulatory scheme does not evince a concern for the protection of drivers who believe that they have been aggrieved through the drug testing process. *Cf. Drake*, 147 F.3d at 170-71; *Schmeling*, 97 F.3d at 1343-44. Furthermore, federal regulations in and of themselves cannot create a private cause of action unless the action is at least implied from the applicable statute. *See Smith v. Dearborn Fin. Servs., Inc.,* 982 F.2d 976, 979 (6th Cir. 1993). Therefore, this Court holds that the district court properly concluded that the FOTETA or the regulations promulgated thereunder do not imply a private cause of action and properly granted summary judgment on Plaintiff's claim.

*Id.* at 308-09.

Although plaintiff's counsel indicated in his argument to the trial court that his action was not premised on a violation of the federal law, he appeared to deviate from this theory in the course of oral argument before this Court. Mr. Saulsberry places great emphasis on a document entitled "Federal Drug Testing Custody and Control Form" (the "Custody Form"). This form requires the individual being tested (donor) to certify that the donor has not adulterated the urine sample, that the split sample bottles were sealed in the donor's presence, and that the information the donor provided to the testing facility on the form is correct. The Custody Form also requires that the technician collecting the sample sign the following certification:

> I certify that the specimen identified on this form is the specimen presented to me by the donor providing the certification on Copy 4 of this form, that it bears the same specimen identification number as that set forth above, and that it has been collected, labeled and sealed as in accordance with applicable Federal requirements.

It is undisputed that the technician never signed this certification, although she signed other portions of the Custody Form.

During oral argument, plaintiff's counsel and the Court had the following exchange:

> *Answer:* But, in essence, we would submit to this Court that the contents of that container were unimportant. The issue in this case is whether the Defendant/Appellee LabCorp abided by or adhered to a well-stated standard of care in the handling of this specimen and whether it acted negligently. . . in the way that it reported the results.
>
> *          *          *
>
> Had LabCorp adhered to the standard of care then the contents of that container wouldn't have even been subjected to any analysis because the standard of care, as we've articulated in the record, is not only that the certification should be there, but if it gets to the testing facility . . . without certification, a curative affidavit has to be obtained from the collector. And, if that curing affidavit is not obtained, then the requirement of the standard of care is to report that as "test not performed" - you just simply don't go forward because these safeguards exist for two reasons. Number one, we want to be able to conduct this kind of testing . . . for the public safety. But, secondly, they exist to protect just against the kind of harm that Mr. Saulsberry complains of, and that is, the possibility of error which has devastating effects in the personal life of the test subject.
>
> *          *          *

*Question from Court:* If I understand you correctly, what you're saying is, even if you assume that the specimen that . . . tested positive for cocaine was in fact Mr. Saulsberry's specimen - had LabCorp followed the required federal procedures, the specimen would never have been tested, and he would not have been fired.

*Answer:* That's correct.

Thus, it would appear that Mr. Saulsberry is changing his theory in the appellate court, but, unfortunately, such a theory appears to be asserting a private cause of action under the federal act when, as shown above, no cause of action is created.

We will now consider Mr. Saulsberry's second assertion that the trial court erred because the record established evidence of a genuine issue of material fact as to causation. In his negligence claim, Mr. Saulsberry asserts that the urine specimen tested by LabCorp was not his specimen, and that he was discharged because LabCorp negligently tested the wrong specimen and reported the results to his employer. He asserts that he has never used illegal drugs and that, therefore, the specimen that tested positive for illegal drugs could not have been his specimen.

Mr. Saulsberry apparently relies upon the absence of the signature of the specimen collector as required in Step 5 on the Custody Form. We note that the collector signed the form in the part indicated for Step 6 to show that the specimen was received by the collector, was released by the collector, and sent to the lab. Moreover, Mr. Saulsberry signed the same form, wherein he certified:

I certify that I provided my urine specimen to the collector; that I have not adulterated it in any manner; that each specimen bottle used was sealed with a tamper-evidence seal in my presence; and, that the information provided on this form and on the label affixed to each specimen bottle is correct.

Mr. Saulsberry asserts that the lack of the collector's signature is proof from which the trier of fact could infer that the specimen tested and reported on was not Mr. Saulsberry's specimen. Although we cannot agree that the lack of the signature creates such an inference, we believe the real essence of this case is whether LabCorp was negligent in issuing a certification of the test results without proper certification of the chain of custody, as established by its procedures. LabCorp's certification of the positive lab results without a properly signed Custody Form could be considered a lack of reasonable care to provide correct laboratory results. Under the facts in this record, we believe that this is a dispute of material fact to be resolved by the trier of fact. Admittedly, this is a very close question, but we are mindful of our Supreme Court's admonition in *Evco Corp. v. Ross*, 528 S.W.2d 20 (Tenn. 1975):

The summary judgment procedure was designed to provide a quick, inexpensive means of concluding cases, in whole or in part, upon

issues as to which there is no dispute regarding the material facts. Where there does exist a dispute as to facts which are deemed material by the trial court, however, or where there is uncertainty as to whether there may be such a dispute, the duty of the trial court is clear. He is to overrule any motion for summary judgment in such cases, because summary judgment proceedings are not in any sense to be viewed as a substitute for a trial of disputed factual issues.

*Id.* at 24-25.

Accordingly, the order of the trial court granting LabCorp summary judgment on the negligence claim is reversed. The case is remanded to the trial court for such further proceedings as necessary. Costs of the appeal are assessed to appellee, LabCorp Occupational Testing Services.

_____
W. FRANK CRAWFORD, PRESIDING JUDGE, W.S.